UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

**Mareld Company, Inc.**
                                    Case No. 16-cv-390-PB
   v.                               Opinion No. 2018 DNH 236

**New England Telephone and Telegraph
Company n/k/a Verizon New England Inc.**


                    MEMORANDUM AND ORDER


    Mareld Company seeks to hold New England Telephone and Telegraph Company ("NET") liable for the cleanup of polychlorinated biphenyl ("PCB") contamination at a commercial property that Mareld leased to NET.  NET argues that Mareld's state-law claims for breach of contract and negligence per se are time-barred.  It is undisputed that this action was filed more than three years after the lease ended, which is the applicable limitations period.  Accordingly, I must determine whether the discovery rule tolls the statute of limitations.

                        I.  BACKGROUND

A.  Lease Agreements

    From 1970 until 2011, NET leased a motor vehicle garage facility located at 100 Tri City Road in Somersworth, New Hampshire from Mareld and its predecessors.  The garage was constructed around 1970, shortly before NET took possession. The original lease agreement, executed in 1970, provided for a

twenty-year lease term.  A provision in the 1970 lease stated that "at the expiration of the said term [NET] will quit and surrender the leased premises in as good state and condition as reasonable use and wear thereof and alternations therein will permit."  Doc. No. 34-8 at 1.

When the 1970 lease expired in 1990, Mareld and NET signed a new lease agreement for a five-year period.  The parties later executed four amendments to the 1990 lease, extending the lease term incrementally through October 2011.  At the end of the term, the 1990 lease required NET to "peaceably yield up [the] Premises and all additions thereto to [Mareld], leaving the same clean and in such repair, order and condition as in the Commencement date."  Doc. No. 34-10 at 4.

NET vacated the facility in 2008, when it sold its northern New England landline telephone business to FairPoint Communications.  FairPoint continued to use the facility until October 2011, paying $37,541 in monthly rent at the end of the lease term.  Doc. No. 81-3 at 2.  I assume, without deciding, when resolving the statute-of-limitations issue that NET remained responsible to Mareld under the 1990 lease during FairPoint's occupancy.

**B.   PCB Detections**

PCBs were first detected at the facility in 1990, during a routine cleaning of garage floor drains.  NET's environmental

consultant, Clean Harbors, conducted wipe sampling of four floor drains and the surrounding garage floor surface and collected soil samples from the drain discharge area behind the garage. Testing confirmed PCBs exceeding the regulatory limit in the garage floor drains and the drain discharge soil. The contaminated soil was removed, and the floor drains were decontaminated following the United States Environmental Protection Agency's cleaning instructions. Another round of sampling and testing revealed the continued presence of PCBs above the regulatory limit in the floor drains. Clean Harbors noted these results in an October 1990 report and stated that the type of PCB mixture detected, Aroclor 1254, "was once a common constituent of transformer oil, and it is possible that PCBs were at some time in the past released during the handling of transformers in the garage." Doc. No. 79-8 at 34.

At NET's behest, Clean Harbors conducted another round of cleaning and follow-up sampling. In a May 1991 report, Clean Harbors stated that the second remediation reduced the PCB levels to below the regulatory limit and that no further action was needed. Doc. No. 79-8 at 39. Mareld received both reports around the time they were issued. The reports were submitted to the New Hampshire Department of Environmental Services ("DES"), which did not require additional assessment or remediation.

In connection with refinancing the property in 1991, Mareld hired Groundwater Technologies, Inc. ("GTI") to prepare an environmental site assessment report. GTI collected a composite groundwater sample and soil samples from the floor drain discharge area and three locations where monitoring wells were installed. Testing confirmed that, where detected, PCB levels were below the regulatory limit. Doc. No. 79-8 at 12, 15.

In 2010, FairPoint retained St. Germain Collins to assess the utility pole storage yard at the facility for various contaminants. St. Germain Collins collected soil samples from the pole storage areas, pole debris pile, and adjacent areas. Aroclor 1254, the same PCB mixture found in 1990-91, was detected in the upper six inches of some soil samples. The contaminated soil was removed in August 2011. Confirmation sampling showed that any remaining PCBs in the pole yard were below the regulatory limit. St. Germain Collins submitted a report dated October 3, 2011 to DES, which summarized its investigation and remedial actions and noted that the cause of the PCB contamination was unknown. Doc. No. 79-9 at 7-10. In December 2011, DES issued a "no further action" letter and removed the property from its active project list. Doc. No. 79-10.

FairPoint kept Mareld apprised of St. Germain Collins's investigation, and Mareld received a copy of the October 3, 2011

4

report around the time it was prepared. That same month, Mareld's consultant, GeoInsight, observed oil stains on the garage floor during an inspection of the property but did not test the floor for PCBs. FairPoint vacated the facility by the end of October 2011, when the 1990 lease ended.

In 2014, Mareld decided to sell the property. As part of its pre-sale due diligence, a prospective buyer retained Nobis Engineering to conduct a "Phase I" environmental site assessment. Nobis reviewed the historical environmental reports on file with DES as part of its assessment. The 1990-91 detection of PCBs in the garage floor drains, coupled with oil stains on the garage floor that Nobis observed, suggested to Nobis that PCBs may have contaminated the concrete floor. Doc. No. 60-1 at 28. The prospective buyer then tasked Nobis to complete a "Phase II" environmental site assessment, which included testing samples of the garage floor for PCBs. Nobis quoted a total price of $11,000 for the Phase II assessment. Doc. No. 81-2. The results showed the presence of Aroclor 1254 above the regulatory limit in all ten concrete samples. Doc. No. 35-13 at 2-3.

GeoInsight subsequently determined that there was widespread PCB contamination of the garage floor that required remediation. Doc. No. 35-14. After NET refused to address the

5

problem, Mareld spent nearly $1.5 million to clean up the contamination.

**C.   Procedural History**

Mareld filed this action on July 20, 2016 in New Hampshire Superior Court, alleging claims for (1) breach of contract, (2) violation of Section 147-A:9 of the New Hampshire Revised Statutes, (3) contribution pursuant to Section 147-B:10 of the New Hampshire Revised Statutes, (4) contribution pursuant to Section 507:7-f of the New Hampshire Revised Statutes, (5) negligence, and (6) negligence per se based on a violation of Section 147-A:9.  NET removed the case to federal court based on diversity of citizenship, 28 U.S.C. § 1332.

After eighteen months of discovery, NET filed a motion for summary judgment on all claims.  At a hearing held on September 17, 2018, I granted in part and denied in part NET's motion.  I granted the motion with respect to all of Mareld's claims except its claims for contribution pursuant to Section 147-B:10, breach of contract based on NET's failure to return the premises in good and clean condition, and negligence per se.  See Doc. No. 74 (order summarizing oral rulings).

In its summary judgment briefing and at oral argument, NET asserted a statute-of-limitations defense with respect to Mareld's breach-of-contract and negligence-per-se claims.  In response, Mareld argued that the discovery rule tolled the

6

limitations period until the 2014 discovery of PCBs. I declined to resolve the issue on summary judgment, and the parties agreed that New Hampshire law authorizes the court to make a factual determination on the applicability of the discovery rule. Because none of the underlying facts are in dispute on this issue, the parties also agreed that I can determine whether the discovery rule applies based on the existing record without holding an evidentiary hearing. To aid my determination, I directed the parties to file supplemental briefs addressing the statute of limitations issue in greater detail.

## II. STANDARD OF REVIEW

The statute of limitations is an affirmative defense. Lamprey v. Britton Constr., Inc., 163 N.H. 252, 257 (2012). The defendant bears the burden of proving that the defense applies by showing that the action was not filed within the limitations period. Id. The burden then shifts to the plaintiff to prove that the discovery rule saves the claims. Id.; Kelleher v. Marvin Lumber & Cedar Co., 152 N.H. 813, 825 (2005).

The discovery rule is an exception to the defense that tolls the statute of limitations until the plaintiff knows or reasonably should have known of its injury and the causal connection between the injury and the defendant's conduct. Kelleher, 152 N.H. at 824-25. The rule is not intended to toll the limitations period until the full extent of the plaintiff's

7

injury becomes known.  *Furbush v. McKittrick*, 149 N.H. 426, 431 (2003).  Rather, the limitations period is tolled until "the plaintiff could reasonably discern that he suffered some harm caused by the defendant's conduct."  *Id.*  The plaintiff "need not be certain of this causal connection; the possibility that it existed will suffice to obviate the protections of the discovery rule."  *Beane v. Dana S. Beane & Co., P.C.*, 160 N.H. 708, 713 (2010).

Whether the plaintiff exercised reasonable diligence in discovering the injury and its causal relationship to the defendant's conduct is a question of fact.  *Kelleher*, 152 N.H. at 825; *Keshishian v. CMC Radiologists*, 142 N.H. 168, 179 (1997).  Because the discovery rule is equitable in nature, the court may act as the trier of fact.  *Kelleher*, 152 N.H. at 825.  The court may decide the issue at an evidentiary hearing before trial, which "is often most economical and equitable."  *Id.*  Alternatively, the court may rule after trial or submit the question to the jury.  *Id.*  Where the underlying facts that bear on the applicability of the discovery rule are undisputed, the court may resolve it based on the evidence in the record without holding an evidentiary hearing.  *Cf. Keshishian*, 142 N.H. at 177-78 (resolving applicability of discovery rule based on contract interpretation where plaintiff rested his argument solely upon its "clear language").

8

### III. ANALYSIS

The three-year limitations period established in Section 508:4 of the New Hampshire Revised Statutes applies to Mareld's common-law claims for breach of contract and negligence per se. See Black Bear Lodge v. Trillium Corp., 136 N.H. 635, 638 (1993). Unless tolled by the discovery rule, that period begins to run from the date of the act or omission giving rise to the injury. Id.; see N.H. Rev. Stat. Ann. § 508:4, I.

It is undisputed that NET's allegedly wrongful acts or omissions happened, at the latest, in October 2011, when FairPoint vacated the premises at the end of the 1990 lease. This is the latest point in time when the PCB contamination that gives rise to the negligence-per-se claim could have occurred.[1] Likewise, this is when NET allegedly breached its contractual obligation to return the facility to Mareld in good state and clean condition.[2] Mareld filed this lawsuit in July 2016, almost

---

[1] The negligence-per-se claim is premised on NET's alleged violation of Section 147-A:9 of the New Hampshire Revised Statutes, which provides that "[a]ny owner, operator, generator, or transporter who causes or suffers the . . . disposal of hazardous waste in violation of RSA 147-A . . . shall be strictly liable" for the costs of containment, cleanup and removal of the hazardous waste. The New Hampshire Supreme Court has recognized a common-law private right of action for a causal violation of this statutory duty. See Bagley v. Controlled Env't Corp., 127 N.H. 556, 561-62 (1986).

[2] Mareld appears to allege that NET violated both the "good state and condition" clause in the 1970 lease and the "clean" condition clause in the 1990 lease when NET returned the PCB-

9

five years later.  The statute of limitations thus bars the claims unless Mareld can prove that the discovery rule tolled the limitations period until July 2013 or later such that its claims were timely filed.

The parties agree that Mareld did not learn that the garage floor was contaminated with PCBs until 2014, when the contamination was discovered as part of a prospective buyer's due diligence.  The question, therefore, is whether Mareld, with reasonable diligence, should have known of the contamination and its link to NET's operations more than three years before it filed its complaint.  See [Kelleher, 152 N.H. at 824-25](Kelleher, 152 N.H. at 824-25).  Based on the undisputed evidence in the record, I find that a reasonably diligent person in Mareld's position would have discovered the contamination and the possibility that NET caused it between October 2011 and July 2013.  Mareld's failure to investigate the matter during this period was unreasonable, depriving it of the benefit of the discovery rule.

By the time the tenancy ended in October 2011, there was enough indication of a potential PCB contamination and its connection to NET's use of the facility to put Mareld on

---

contaminated property to Mareld in 2011.  The question whether Mareld has enforceable rights under the 1970 lease has not been sufficiently briefed or argued.  For purposes of this motion, I assume, without deciding, that Mareld's breach-of-contract claim is based on both lease provisions.

reasonable notice that further investigation was needed.  When the tenancy ended, Mareld knew that the same PCB mixture, at levels requiring cleanup, had been discovered in multiple locations on the property on multiple occasions.  Mareld was informed in 1990 and 1991 that Aroclor 1254 was found in the garage floor drains and the drain discharge soil.  Remediation efforts included two rounds of drain cleaning and removal of the impacted soil.  Mareld received a copy of the Clean Harbors October 1990 report, which specifically noted that the contamination was potentially attributable to NET's operations involving the handling of PCB-laden transformers in the garage.

The discovery of the same PCB mixture in the pole storage yard in 2011 indicated that the earlier contamination was not an isolated phenomenon.  Mareld again received a contemporaneous copy of the environmental assessment report detailing the discovery and subsequent removal of the contaminated soil.  St. Germain Collins reported that the cause of the contamination was unknown.  Mareld took no steps to determine the cause or investigate other areas for potential contamination, despite knowing that NET may have disposed of this PCB mixture at the facility.  Moreover, during an inspection of the garage in October 2011, Mareld's consultant observed oil stains on the garage floor but did not test the floor or any other location for PCBs.

11

PCBs were repeatedly detected at a facility that, for more than forty years, was in the sole possession of a telephone company that potentially disposed of PCBs as part of its operations. That situation triggered a duty to investigate whether unremediated PCBs remained on the property once the tenancy ended. Mareld's failure to investigate whether there was actionable conduct in the nearly two-year period after the telephone company left the premises was unreasonable. Cf. New W. Urban Renewal Co. v. Viacom, Inc., 230 F. Supp. 2d 568, 573-76 (D.N.J. 2002) (discovery rule inapplicable where new owner of contaminated property failed to timely investigate its claims against prior owner despite knowledge of reports reflecting potential environmental contamination and prior owner's use of hazardous substances during its lengthy occupancy).

The fact that NET and FairPoint remediated the known PCB contaminations to DES's satisfaction did not absolve Mareld of the duty to investigate further. The appreciable risk of unknown contamination arising from the recurrent PCB discoveries and NET's historical use of the site triggered the duty to investigate the matter. Cf. Vector-Springfield Props., Ltd. v. Cent. Ill. Light Co., 108 F.3d 806, 809-10 (7th Cir. 1997) (plaintiff put on notice of need to investigate potential environmental contamination of land adjoining site of defunct

manufacturing plant when it became aware of risk that such plants could contaminate neighboring lands).

Armed with the same information concerning the property that Mareld had, a potential buyer in 2014 readily determined that testing the garage floor for PCBs was warranted. All ten samples of the concrete floor tested were contaminated with Aroclor 1254, the same PCB mixture found in the garage floor drains and the drain discharge soil in 1990-91 and the pole yard in 2011. Had Mareld conducted similar tests, it would have discovered the PCB contamination.

Mareld acknowledges that it was reasonable for the buyer to test for PCBs but argues that it should not be held to the same standard. In support, Mareld cites only to an affidavit of its principal, Charles Denault, who stated that for a commercial lessor like Mareld, the cost of PCB testing "would be prohibitive, and possibly more than the rent received" given "the volume of tenants a lessor may have." Doc. No. 80 ¶ 7. But this property effectively had only one tenant for more than forty years, and Mareld was receiving more than $37,000 in monthly rent by the end of the lease term. The price that Nobis quoted to the buyer for a Phase II site assessment that included PCB testing ($11,000) was less than one-third of one month's rent that Mareld collected. Under the circumstances, a reasonably diligent lessor in Mareld's position would have spent

the money to determine if its long-term tenant left PCBs behind when it vacated the premises. The discovery rule therefore cannot toll the limitations period in this case.

## IV. CONCLUSION

For the foregoing reasons, I find as a matter of fact that Mareld's claims for breach of contract (Count I) and negligence per se (Count VI) are barred by the statute of limitations. The claims are dismissed with prejudice.

SO ORDERED.

/s/ Paul Barbadoro
Paul Barbadoro
United States District Judge

November 28, 2018

cc: Terri L. Pastori, Esq.
    Beth A. Deragon, Esq.
    Jeffrey M. Karp, Esq.
    Nathaniel R. Koslof, Esq.
    Nicholas M. O'Donnell, Esq.
    Kyle M. Noonan, Esq.
    Mark B. Rosen, Esq.